1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

EDWARD WARKENTINE, DANIEL TANKERSLEY,

　　　　　Plaintiffs,

　　v.

HECTOR J. SORIA, et al.,

　　　　　Defendants.

Case No.  1:13-cv-01550-MJS

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND**

**GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**(ECF NOS. 84, 86-87)**

**CASE TO REMAIN OPEN**

I.　　**INTRODUCTION AND PROCEDURAL HISTORY**

　　　Plaintiffs Edward Warkentine and Daniel Tankersley (jointly, "Plaintiffs") initiated this action on September 25, 2013. They are proceeding on a second amended complaint filed on June 2, 2014, alleging, generally, that Defendants searched, seized, and took Plaintiffs' personal property without any compensation in violation of the Civil Rights Act, 42 U.S.C. § 1983, and the Fourth, Fifth and Fourteenth Amendments. (ECF No. 55.) This matter is before the undersigned for all purposes pursuant to the consent of the parties. (ECF No. 62.)

　　　This action proceeds against the following Defendants[1]:

---

[1] In their opposition to Defendants' motion for summary judgment, Plaintiffs dismiss their claims against Joseph Amador, Leo Capuchino, John Flores, Robert Silva, Joseph Riofrio, Hector Lizarraga, and Bryce

1. The City of Mendota ("City");

2. Mendota City Code Enforcement Officers Hector J. Soria and Daniel Gosserand;

3. Mendota City Police Officers Gerry Galvin, Johnny A. Lemus and Francisco Amador;

4. Mendota City Hearing Officer and City Manager Kristal Chojnacki;

5. Martin Hernandez and Smitty's Towing & Auto Dismantling[2]; and

6. Abraham Gonzalez, Felipe Gonzalez, and Gonzalez Towing & Tire Shop[3].

This case is set for a pretrial conference on January 29, 2016, at 1:30 p.m., and a jury trial on March 1, 2016, at 8:30 a.m. (ECF No. 109.)

On September 30, 2015, Defendants the City, Soria, Gosserand, Galvin, Lemus, Amador, and Chojnacki (collectively, "the Mendota Defendants" or "Defendants")) moved for summary judgment on all of Plaintiffs' claims. (ECF No. 84.) Also on September 30, 2015, Plaintiffs moved for partial summary judgment on their procedural due process and taking claims against the City, Gosserand, Soria, and Chojnacki. (ECF No. 87.) Both motions are fully briefed and ready for disposition.

II.  **UNDISPUTED FACTS[4]**

A.  **Relevant Background**

At issue in this case is the Defendants' nuisance abatement activity related to the following properties located in Fresno County, California, and owned by Plaintiffs Edward Warkentine and/or Daniel Tankersley: APN 013-192-09, 013-152-27s, 013-116-

---

Atkins. See Pls.' Opp'n at 23. (ECF No. 90 at 8). Accordingly , these Defendants are dismissed from this action.

[2] Default has been entered as to these Defendants. ECF No. 41.

[3] Defendants Martin Hernandez, Smitty's Towing & Auto Dismantling, Abraham Gonzalez, Felipe Gonzalez, and Gonzalez Towing & Tire Shop will be referred to collectively as the "Towing Defendants."

[4] All facts set forth here are undisputed unless noted otherwise.

13, 013-118-11, and 013-115-10. At the time, three of these properties were located in residential (R-1) zoned districts. Chojnacki Decl. ¶ 2. The other two, APN 013-115-10 and 013-152-27s, were located in M-1 (Light Manufacturing) districts. Id.

Daniel Tankersley has an ownership interest in APN 013-115-10 and APN 013-152-27s. Tankersley Decl. ¶ 5. He inherited his interest in these properties on June 19, 2009, following the final distribution of the Estate of Elbert Davidson.[5] Tankersley Decl. ¶ 4. On March 11, 2010, new deeds were prepared and notarized for the transfer of these two properties and on April 26, 2010 they were submitted to the Fresno County Recorder's Office. Id. ¶ 5. Since June 6, 2010, when the deeds were recorded, the property's mailing address has been P.O. Box 29, Nubieber, California 96068. Id. During all times relevant to this action, Tankersley received his tax bills for these properties at the Nubieber address. Id. ¶ 8.

## B.   The Public Nuisance Notices

Enforcement of the Mendota Municipal Code ("the Code") and resolution of any issues related to the manner in which it is enforced is the responsibility of the City Manager. Silva Dep. at 28:15-24; Amador Dep. at 61:6-9.

As relevant here, the City Manager gave guidance on the nuisance abatement procedures to the Code Enforcement Officers. Gosserand Dep. at 20:17-24; Soria Dep. at 46:17-20. The City Manager set a priority list for cleaning up certain properties in Mendota; Plaintiffs' properties were on the priority list and at one point were the top priority. Soria Dep. at 33:9-21.

The City Council members did not get involved in the enforcement of the Code, instead leaving it to the discretion of the City Manager. See Silva Dep. at 26:8—27:11.

On May 15, 2010, Defendant City Code Enforcement Officer Hector Soria mailed five separate public nuisance notices to Edward Warkentine at 1583 Eighth Street,

---

[5] Elbert Davidson passed away in 2006. Tankersley Dep. at 39:2-7.

3

Mendota, California, 93640, regarding the properties at issue in this case ("the Public Nuisance Notices"). Joint Statement of Undisputed Facts ("JSUF") ¶ 17. These notices were mailed to the names and addresses shown on the last equalized assessment roll in Fresno County.[6] Soria Decl. ¶ 2.

Each of these notices indicated that the property was in violation of the Mendota Municipal Code, specifically, Sections 8.28.030 (public nuisance) and 8.24.020 (trash and junk). Soria Decl. Ex. A. The notices summarily referred to the following subsections: 6 (accumulation of trash and junk), 8 (attractive nuisance to children), 12 (an unpermitted obstruction of or encroachment on public property), 13 (abandoned, inoperative or dismantled vehicle), and 15 (vacant lots not maintained free of weeds, trash, etc.). Defs.' Req. Judicial Notice ("DRJN"), Ex. A; see also Soria Decl. ¶ 3, Ex. A.

Warkentine received at least 4 of the 5 notices.[7] Soria Decl. ¶ 2; Warkentine Dep. at 26:2-10. Tankersley did not receive these notices and has never received mail at the 1583 Eighth Street address. Tankersley Decl. ¶¶ 6, 10.

### C.   The Abatement Notice and the Notices of Administrative Hearing

On August 3, 2010, Defendant Soria mailed to both Plaintiffs at 1583 Eighth Street, Mendota, California 93640, a "Notice of Intention To Abate and Remove An Abandoned, Wrecked, Dismantled, Or Inoperative Vehicle of Parts Thereof as a Public Nuisance" ("the Abatement Notice") identifying 10 allegedly abandoned, wrecked, dismantled, or inoperative vehicles on APN 013-152-27s and notifying the Plaintiffs that they had 10 days to abate the alleged nuisance or request a public hearing. JSUF ¶ 18; Soria Decl. Ex. B.

---

[6] Defendants assert that the Court may take judicial notice that these assessment roles are prepared as of June 30 of each year, see Defs.' Mot. Summ. J. at 7, but fail to submit a request for judicial notice in support. Nonetheless, absent reason to do otherwise, the Court will proceed on the assumption that this is true for purposes of the parties' cross-motions for summary judgment.

[7] Soria received return receipts signed by Warkentine on all but APN 013-116-13. Soria Decl. ¶ 2.

In response to the Abatement Notice, Plaintiffs' attorney, Diane Anderson, requested a public hearing. JSUF ¶ 19.

On November 6, 2010, the City of Mendota mailed five notices—again to 1583 Eighth Street, Mendota, California 93640—titled "Notice of Administrative Hearing to Determine the Existence of Public Nuisance and to Abate In Whole Or Part" ("the Notices of Administrative Hearing"). These notices were addressed to:

> Edward Warkentine and Elbert Davidson concerning APN 013-152-27.
>
> Edward Warkentine concerning APN 013-115-10.
>
> Edward Warkentine concerning APN 013-115-11.
>
> Edward Warkentine and John Warkentine concerning APN 013-192-09.
>
> Edward Warkentine concerning APN 013-116-13.

JSUF ¶¶ 20-24. Each of these notices indicated that a hearing would be held on November 16, 2010. See Soria Decl. Ex. C.

Tankersley did not receive any of these notices. Tankersley Decl. ¶ 11. Instead, he heard third-hand about a possible hearing on one parcel (865 Naple Street) for a non-nuisance issue. Id.

### D.   The Administrative Hearing

On November 16, 2010, an administrative hearing was held before Defendant Kristal Chojnacki, the City Manager who was acting as the Hearing Officer. JSUF ¶ 25, Pls.' Sep. Statement of Undisputed Facts ("PSSUF") ¶ 1.

Both Plaintiffs appeared at the hearing with their attorney. JSUF ¶ 25. The nuisance conditions on all of the properties were considered at the hearing, and both Tankersley and Defendant Soria testified; Warkentine did not testify.

Tankersley testified that he cleaned up all oils and tires from the properties and obtained an EPA number for removal of these items. Tankersley Decl. ¶ 14. He stated

that he spent a large amount of money cleaning up the properties, demolishing houses, and relocating personal property in reliance on a prior agreement with the City of Mendota that the properties would be rezoned to M-2. Id. He testified that he is the record owner of APN 013-115-10 and APN 013-010-27s and presented a tax bill with his name and proper address on it. Id.

Defendant Soria also testified at the hearing regarding the nuisance conditions on the properties. Soria Decl. ¶ 6. His testimony was based on photographs of the properties. Id. Ex. D.

At the conclusion of the hearing, Chojnacki gave Tankersley until December 6, 2010, to submit additional evidence or documentation in support of his position. Chojnacki Decl. ¶ 5. No additional documents or evidence was submitted by Tankersley following the hearing. Id. ¶ 8.

After the hearing, Chojnacki, Soria and Tankersley drove by each of the properties to observe their present condition. Soria Decl. ¶ 7. Tankersley showed Soria and Chojnacki the conditions on the properties that verified his testimony, including the removal of hundreds of tires as well as the oils from the oil barrels. Tankersley Decl. ¶ 20. Notwithstanding the removal of the tires, Soria and Chojnacki determined that the properties remained in substantially the same condition as shown in the photographs submitted by Soria. Soria Decl. ¶ 7; Chojnacki Decl. ¶ 7.

### E.    The Abatement Decision

On March 30, 2011, Chojnacki issued "Findings Regarding Appeal of Notice of Nuisance and to Abate Vehicles" ("the Abatement Decision") in which nuisance conditions were found to exist on all five parcels. JSUF ¶ 26; Chojnacki Decl. Ex. A. The Abatement Decision ordered that Edward Warkentine (and not Daniel Tankersley) remedy the alleged violations claimed therein, including, to "remove all accumulated materials, junk and trash" and "remove all inoperative vehicles" from certain parcels

within thirty days. JSUF ¶ 27. Each of the Plaintiffs received a copy of the Abatement Decision. Warkentine Dep. at 28:19-22; Tankersley Dep. at 49:8-16.

As to the propriety of the notice provided to Plaintiffs, the Abatement Decision found as follows:

> Mr. Tankersley contended that he did not receive the notices, although he received tax bills for the real property at his Post Office Box 29, Nubieber, California, 96068 address. He did not provide any evidence that the real property was vested in his name or that he was the record owner of the same, other than his oral testimony. Mr. Warkentine did not contest that notice had been given to him. [¶] On the basis of the evidence provided by the City, the Hearing Officer finds that notice had been given, based upon the fact that Mr. Warkentine did not contest notice and Mr. Tankersley is not the record owner of the real property as set forth below. As a result of this finding, notice was properly given and the appeal regarding notice is denied.

Chojnacki Decl. Ex. A, ECF No. 84-14 at 3.

Chojnacki also found that Tankersley failed to prove any ownership interest in any real or personal property in the City of Mendota:

> Mr. Tankersley did not provide any documentation that he is the owner of any real or personal property in the City of Mendota. Mr. Tankersley testified that he was the Executor of the Estate of Elbert Davidson. However, there is no evidence in the record that the Estate was ever closed or that Mr. Tankersley had any beneficial interest in any real or personal property. Additionally, there is no showing that any title to any of the real or personal property at issue in this appeal is vested in Mr. Tankersley. A property tax bill is not evidence of ownership, but rather that Mr. Tankersley was paying property taxes, which is consistent with his testimony that he was the Executor.

Chojnacki Decl. Ex. A, ECF No. 84-14 at 4.

Neither Chojnacki nor the Abatement Decision gave the Plaintiffs any information regarding filing an appeal. See Chojnacki Decl. Ex. A; Chojnacki Dep. at 72:1-11, ECF No. 99 at 6. The Plaintiffs did not appeal the Abatement Decision. Chojnacki Decl. ¶ 11.

On May 27, 2011, Soria posted the Abatement Decision on each of the five properties. Soria Decl. ¶ 9. He also mailed the Abatement Decision to:

> Edward Warkentine and Elbert Davidson at 1583 8th Street, Mendota, California 93640, concerning APN 013-152-27.

> Edward Warkentine at 1583 8th Street, Mendota, California 93640, concerning APN 013-115-11.

> Edward Warkentine and John Warkentine at 1583 8th Street, Mendota, California 93640, concerning APN 013-192-09.

> Elbert Davidson at PO Box 29, Nubieber, California 96068, concerning APN 013-115-10.

> Edward Warkentine at 1583 8th Street, Mendota, California 93640, concerning APN 013-116-13.

Soria Decl. ¶ 9, Ex. E.

Plaintiffs did not comply with the Abatement Decision.

On June 13, 2011, Soria signed five documents for recording entitled "Order of Abatement," each of which referenced one of the five properties to be abated and had attached to it the Abatement Decision. Soria Decl. ¶ 10, Ex. F. These documents were recorded in the Fresno County Recorder's Office on June 16, 2011. Id.

**C.    Removal of Plaintiffs' Personal Property**

**1.    APN 013-152-27s**

On September 23, 2011, Soria supervised the abatement of APN 013-152-27s, which was an unfenced vacant parcel. Soria Decl. ¶ 12. He did not obtain an inspection warrant to go on the property because he believed it constituted an attractive nuisance to children. Id.

Soria determined the items to be removed by reviewing the Abatement Decision and the Municipal Code. Soria Decl. ¶ 13. The inoperable vehicles and parts of vehicles had previously been tagged with 10-day abatement notices pursuant to the Municipal Code. Id. Prior to towing the vehicles, Soria filled out a CHP 180 form for each of the inoperable or junked vehicles to be towed. Id.

Defendant Officers Francisco Amador and Johnny Lemus were present at the direction of Defendant Chief of Police Gerald Galvin. F. Amador Decl. ¶¶ 2-6; Lemus Decl. ¶¶ 2-8; Galvin Decl. ¶¶ 2-4. They understood their role to keep the peace and to assist in filling out abandoned and inoperative vehicle report forms. See id.

The City contracted with Defendant Gonzalez Towing to remove the offending items from the property. JSUF ¶ 28. Pursuant to the agreement with the City, Gonzalez Towing was given control and possession of the seized property. Chojnacki Decl. Ex. B.

## 2. The Inspection Warrant for APN 013-115-10, 013-116-13, 013-118-11, and 013-192-09

On April 4, 2012, Defendant City Code Enforcement Officer Dan Gosserand submitted a declaration seeking an Inspection Warrant ("the Inspection Warrant") from the Fresno County Superior Court. JSUF ¶ 29; Gosserand Decl. Ex. A. The declaration provided that the warrant shall only be served and acted upon after the expiration of 24 hours from the time of posting of the warrant on each of the affected properties. Gosserand Decl. Ex. A, ECF No. 84-11 at 5.

The Inspection Warrant was signed by Superior Court Judge Gary Orozco on April 4, 2012, authorizing the entry upon, and abatement of, the four fenced parcels of property: APN 013-115-10, 013-116-13, 013-118-11, and 013-192-09.[8] JSUF ¶¶ 29, 30; Gosserand Decl. ¶ 4, Ex. A.

---

[8] Though the Inspection Warrant itself does include a date, Gosserand declares that Judge Orozco signed it on April 4, 2012. Gosserand Decl. ¶ 4.

On April 7, 2012, Gosserand posted the Inspection Warrant and Affidavit on each of the four properties. Gosserand Decl. ¶ 6, Ex. B. Plaintiffs assert that the Inspection Warrant was not served on them. See Tankersley Decl. ¶ 24.

The abatement of the properties began on April 9, 2012. Gosserand Decl. ¶ 7. The City contracted with Defendant Gonzalez Towing to remove the items from parcels APN 013-115-10 and 013-192-09. JSUF ¶ 31; Chojnacki Decl. Ex. C. The City also contracted with Defendant Smitty's Towing to remove items from parcels APN 013-116-13 and 013-118-11. JSUF ¶ 31; Chojnacki Decl. Ex. D. Pursuant to these agreements, the Towing Defendants were given control and possession of the seized property. Chojnacki Decl. Exs. C-D.

During the abatement of APN 013-115-10, Defendants opened a locked shed and removed tools. Tankersley Decl. ¶ 30. From APN 013-192-09, Defendants seized items from a garage-like structure following discussions with a Code Enforcement Officer. Gonzalez Dep. at 51:5-17.

On April 9, 2012 Gosserand affixed 10-day Vehicle Abatement Notices to all inoperable and partially dismantled vehicles situated on the four parcels. Gosserand Decl. ¶ 8. On April 19, 2012, Gosserand filled out CHP 180 forms for the vehicles and portions of vehicles to be towed and took photographs of the condition of the vehicles. Id. ¶ 10.

Defendant Officers Francisco Amador and Johnny Lemus were present at the direction of Defendant Chief of Police Gerald Galvin. F. Amador Decl. ¶¶ 2-6; Lemus Decl. ¶¶ 2-8; Galvin Decl. ¶¶ 2-4. They understood their role to keep the peace and to assist in filling out abandoned and inoperative vehicle report forms. See id.

On April 20, 2012, the abatements were completed. Gosserand Decl. ¶ 12.

The City did not pay the Towing Defendants for the abatements. See Abraham Gonzalez Dep. at 45:6-11. The City did not require the Towing Defendants to retain or store the property. Chojnacki Decl. ¶ 4; Chojnacki Dep. at 94:7-13.

**D.    Post-Removal Notices**

The City did not give written notice to Edward Warkentine or Daniel Tankersley setting forth a procedure for recovery of the personal property removed by the Towing Defendants. JSUF ¶ 32.

The City took no action to assess the cost of removing the items against any of the Plaintiffs' properties. JSUF ¶ 33.

Plaintiffs value the loss of their personal property at over $1,500,000.00. Pls.' Opp'n Ex. 6.

## III.    LEGAL STANDARD

Any party may move for summary judgment, and "[t]he [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of

proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party." Id. at 984. In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id. (citing Celotex, 477 U.S. at 323). Once the moving party has met its burden, the nonmoving party must point to "specific facts showing that there is a genuine issue for trial." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).

In ruling on a motion for summary judgment, a court does not make credibility determinations or weigh evidence. See Liberty Lobby, 477 U.S. at 255. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. Only admissible evidence may be considered in deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(2). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." Soremekun, 509 F.3d at 984.

## IV.   PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

To succeed on their Section 1983 claims, Plaintiffs must demonstrate that the action (1) occurred "under color of state law," and (2) resulted in the deprivation of a constitutional or federal statutory right. Leer v. Murphy, 844 F.2d 628, 632-33 (9th Cir. 1988) (citations omitted); see also Lugar v. Edmondson Oil Co., 457 U.S. 922, 924 (1982). Since the parties do not dispute whether Defendants acted under color of state law, the Court is asked to consider only whether, by their actions, Defendants violated Plaintiffs' constitutional rights.

### A.   Search and Seizure

The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, protects "persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Lavan v. City of Los Angeles, 693 F.3d 1022 (9th Cir. 2012), explains:

The Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when the government intrudes upon an expectation of privacy that society is prepared to consider reasonable. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."

Id. at 1027 (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)). Whether a search or seizure is at issue, the relevant inquiry under the Fourth Amendment is one of reasonableness—"[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." See Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citations omitted). Whether a seizure is unreasonable under the Fourth Amendment depends upon the particular facts and circumstances. See Miranda v. City of Cornelius, 429 F.3d 858, 862 (9th Cir. 2005).

### 1.   Search and Seizure of Plaintiffs' Unfenced Property

The Court turns first to Plaintiffs' claims regarding Defendants' warrantless entry onto parcel APN 013-152-27s, an unfenced and vacant lot. Absent an exception, the Fourth Amendment generally proscribes warrantless "entr[y] onto private land to search for and abate suspected nuisances." Conner v. City of Santa Ana, 897 F.2d 1487, 1490 (9th Cir. 1990) (citations omitted); Camara v. Municipal Court, 387 U.S. 523, 530 (1967); see also Schneider v. County of San Diego, 28 F.3d 89, 91 (9th Cir. 1994).

One recognized exception to the warrant requirement pertains to the "open fields" doctrine. In Hester v. United States, 265 U.S. 57 (1924), the Supreme Court held that the right to privacy does not extend to a person's open fields. Id. at 59. The Court instructed that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." Id. (citation omitted).

The Supreme Court confirmed the continued vitality of the "open fields" doctrine

13

in Oliver v. United States, 466 U.S. 170, 177-78 (1984). The Court stated in Oliver: "We conclude, as did the Court in deciding Hester v. United States, that the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." Id. at 177.

In Oliver, when the officers arrived at Oliver's farm, "they drove past petitioner's house to a locked gate with a 'No Trespassing' sign." 466 U.S. at 173. Oliver's marijuana field was "bounded on all sides by woods, fences, and embankments and cannot be seen from any point of public access." Id. at 174. The Court held in Oliver that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." Id. at 178 (citation omitted).

Here, it is undisputed that the parcel APN 013-152-27s was an unfenced, vacant lot without a residential structure on it. Accordingly, the Court agrees with Defendants that their entry onto this property without a warrant did not violate the Fourth Amendment because Plaintiffs had no reasonable expectation of privacy there. As no genuine issues of material fact remain for trial, the Court will grant summary judgment on Plaintiffs' Fourth Amendment search claim in favor of Defendants.

This finding does not, however, necessarily lead to the conclusion that the *seizure* of Plaintiffs' property was also reasonable. Removing personal property is a seizure within the meaning of the Fourth Amendment. See e.g., Miranda v. City of Cornelius, 429 F.3d 858, 862 (9th Cir. 2005). A seizure "occurs when there is some meaningful interference with an individual's possessory interests in that property." Lavan, 693 F.3d at 1027 (citing Jacobsen, 466 U.S. at 113).

In this case, Defendants do not dispute that they seized Plaintiffs' personal property from APN 013-152-27s without a warrant. Defendants rely on two grounds for arguing that their warrantless seizure of Plaintiffs' personal property was reasonable.

First, they assert that the abatement hearing was sufficient to establish the

validity and reasonableness of the seizure because Plaintiffs had prior notice that a nuisance was found to exist on the property and that action would be taken. This argument, however, was foreclosed in <u>Conner v. City of Santa Ana</u>, 897 F.2d 1487, 1492 (9th Cir. 1990) ("We conclude that the fourth amendment protected the Conners from the City's warrantless entry onto their property and from the warrantless seizure of their automobiles. The warrant requirement applied to the City when, without the Conners' consent, it broke down their fence, entered their property and seized the automobiles, *regardless of how "reasonable" the warrantless search and seizure appeared in light of the pre-seizure process afforded the Conners*.") (Emphasis added.)

Defendants also assert that an emergency exception existed to the warrant requirement based on their belief that junk and debris on this unfenced property was accessible to children. The burden, of course, is on Defendants to prove this "emergency" exception. They have not met that burden here. To qualify as an emergency, there must be circumstances indicating "some real immediate and serious consequences if [Defendants] postponed action to get a warrant." <u>Sims v. Stanton</u>, 706 F.3d 954, 961 (9th Cir.), *cert. granted, decision rev'd on other grounds*, 134 S. Ct. 3 (2013). Merely hypothesizing about what could happen in the future is not the same as a valid contemporaneous emergency. <u>See e.g.</u>, <u>Allen v. Cnty. of Lake</u>, 2014 WL 5211432, at *3 (N.D. Cal. Oct. 14, 2014) (in the context of a defendant describing ongoing conditions as an "emergency" for the purpose of an exigency exception, finding that a "mere declaration of an immediate threat does not make it so") (quoting <u>Sibron v. New York</u>, 392 U.S. 40, 61 (1968)). Here, there are no facts in the record to establish the existence of a real, as opposed to hypothetical, emergency situation.  Over one year passed from the time Defendants first gave notice of the nuisance conditions on this property and the abatement of that nuisance. There is nothing before the Court to suggest that some calamity occurred or was imminent during that time or would have occurred had Defendants failed to act when and as they did. The absence of any

15

specifically identifiable potential for harm, much less harm itself, from the nuisance belies the need for precipitous action. For these reasons, the Court declines to enter summary judgment for Defendants on Plaintiffs' Fourth Amendment seizure claim related to APN 013-152-27s.

### 2.   Search and Seizure of Plaintiffs' Fenced Properties

Defendants next move for summary judgment on Plaintiffs' Fourth Amendment claims related to the four fenced properties. They claim that the searches and seizures on these properties were authorized by the Inspection Warrant obtained by Defendant Gosserand. Plaintiffs counter that the Inspection Warrant is invalid on its face and that the seizures exceeded the scope of the Inspection Warrant.

### a.   Validity of Inspection Warrant

Plaintiffs argue that the Inspection Warrant is invalid on its face because: (1) it does not identify the properties on its face; (2) it relies on Penal Code Section 1524 et seq., which relates to search warrants for criminal offenses, not nuisance abatements; (3) it is based on alleged misrepresentations by Gosserand; (4) it fails to satisfy the particularity requirement of the Fourth Amendment; and (5) it is undated. The Court will address each of these grounds in succession.

While it is true that the Inspection Warrant does not identify the properties on its face, Plaintiffs do not cite to any provision of any code that requires such identification. To the contrary, California Code of Civil Procedure 1822.51 provides, in relevant part, that "[a]n inspection warrant shall be *supported by an affidavit, particularly describing the place*, dwelling, structure, premises, or vehicle to be inspected and the purpose for which the inspection is made." (Emphasis added.) As there is no dispute that Gosserand's affidavit submitted in support of the Inspection Warrant identified the properties to be abated, the Court rejects Plaintiffs' first argument.

Similarly, the Court does not find that the Inspection Warrant is invalid simply because it incorrectly references the Penal Code on its face.[9] The Inspection Warrant repeatedly references the nuisance conditions on the properties, and, as Plaintiffs concede, Gosserand's affidavit identifies the correct statutory authority under which the warrant would issue. See Pls.' Opp'n at 8 n.2; Gosserand Decl. Ex. A, ECF No. 84-11 at 5 ("This warrant is requested consistent with the authority under Code of Civil Procedure 1822.50 et seq. and the case of *Flahive v. City of Dana Point* (1999) 72 Cal. App. 4th 241."). Plaintiffs' second argument is therefore rejected as well.

Next, Plaintiffs assert that the Inspection Warrant is invalid because Gosserand's affidavit was based on misrepresentations. That argument too is unavailing. Plaintiffs argue Gosserand falsely represented that the property identified in his declaration was lawfully seizable pursuant to the Abatement Order. His declaration listed tires, for example, even though tires were not included in the Abatement Order. But Plaintiffs do not cite to any authority requiring the Abatement Order specifically to list each and every item that is subject to abatement. Plaintiffs also argue that the affidavit falsely lists Elbert Davidson as the owner of APN 013-115-10, even though Tankersley testified at the Abatement Hearing that he is the owner of that parcel. Given the undisputed fact that Tankersley did not submit documentary evidence of his ownership interest in that parcel during or after the Abatement Hearing, Gosserand's reliance on the Abatement Order's conclusion regarding ownership interest was reasonable and does not undermine the validity of the Inspection Warrant.

The Court is also unconvinced that the Inspection Warrant failed to satisfy the Fourth Amendment's particularity requirement. This requirement, which "guards the right to be free from unbounded general searches," United States v. Hillyard, 677 F.2d 1336, 1339 (9th Cir. 1982), is satisfied if there is sufficient information included to

---

[9] The Inspection Warrant relies on Penal Code Section 1524 et seq., which relates to search warrants for criminal activity.

apprise the issuing judge of the scope of the search. The particularity requirement may be met in the inspection warrant or, if certain conditions are met, in the accompanying affidavit. The inspection warrant may be construed with reference to the affidavit for purposes of satisfying the particularity requirement if (1) the affidavit accompanies the warrant, and (2) the warrant uses suitable words of reference which incorporate the affidavit therein. In re Seizure of Property Belonging to Talk of the Town Bookstore, Inc., 644 F.2d 1317, 1319 (9th Cir. 1981).

Plaintiffs argue that these requirements were not met because Gosserand's affidavit was not attached to the Inspection Warrant when posted on the property. In support, they cite to Daniel Tankersley's declaration that he did not see the Inspection Warrant until after the abatement was concluded, and he did not personally observe the affidavit included with the Inspection Warrant on the properties. See Tankersley Decl. ¶ 24. Defendants, however, have submitted both Gosserand's declaration[10] and photographic evidence that the Inspection Warrant, which was posted on each of the four fenced parcels, was stapled to multiple pages (the affidavit and attachments). See Fike Decl. Ex. B, ECF No. 103-3. The Court finds that the particularity requirement has been met in this regard.

Notwithstanding the foregoing, the Court agrees with Plaintiffs that the omission of a date on the Inspection Warrant may render a portion of Defendants' abatement activity unlawful. Pursuant to California Code of Civil Procedure 1822.55, "[a]n inspection warrant shall be effective for the time specified therein, but not for a period of more than 14 days, unless extended or renewed by the judge who signed and issued the original warrant …." Gosserand declared that the Inspection Warrant was signed on

---

[10] In his declaration, Gosserand stated that he posted the "Inspection and Abatement Warrant and Affidavit" on each of the four properties. See Gosserand Decl. ¶ 6. By referencing only the title of the document signed by Judge Orozco, Plaintiffs suggest that Gosserand's declaration fails to specify that he also posted his multi-page affidavit. The Court declines to adopt such an overly technical interpretation of Gosserand's declaration, particularly when the document signed by Judge Orozco incorporates by reference the affidavit and its attachments.

April 4, 2012, and there is no evidence that Defendants sought or received an extension from Judge Orozco after 14 days. Pursuant to Section 1822.55, then, it appears that any abatement occurring after the statutory 14 days—or, after April 18, 2012—would be in violation of the law. Defendants do not address this argument in their Reply. Since the abatement of the four fenced parcels was finalized on April 20, 2012, the Court denies Defendants summary judgment based on the lack of evidence that the warrant remained effective as of the date of the abatement activity.

### b.    Scope of Inspection Warrant

Plaintiffs also argue that summary judgment should be denied because the scope of the actual abatement activity far exceeded that authorized by the Inspection Warrant and Gosserand's affidavit.

Defendants counter that the Inspection Warrant by its terms did not limit the scope of the abatement. Indeed, Gosserand's affidavit, incorporated by reference in the Inspection Warrant, stated:

> It should be noted that the above listed items on the properties are approximations due to the inability to physically enter the property. Actual inventory could vary pending actual physical inspection once a warrant is issued for inspection and abatement.

Gosserand Affid. ¶ 5, ECF No. 8-11 at 5. Defendants thus argue that "the warrant vested the Code Enforcement Officer with inherent discretion to determine how to enforce the abatement warrant."

But this is precisely the sort of discretion that the particularity requirement is intended to foreclose. "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." Stanford v. State of Tex., 379 U.S. 476, 485-86 (1965) (citations omitted).

Based on the record, summary judgment cannot be granted to Defendants on Plaintiffs' Fourth Amendment claim relating to the four fenced parcels. There exists a genuine dispute of material fact as to whether the abatement activity on these parcels exceeded the scope of the Inspection Warrant. For example, during the abatement of APN 013-115-10, tools were removed from a locked shed, and during the abatement of APN 013-192-09, items were taken from a garage-like structure. Both of these activities would have violated the Inspection Warrant. See Gosserand Dep. at 86:8—87:12. Furthermore, while Gosserand's affidavit listed certain specific items to be abated, Plaintiffs claim all of their personal property was removed. To illustrate, the Inspection Warrant listed the following items to be seized from APN 013-115-10: "The area to be searched, inspected and abated contains several inoperable vehicles including; 8 Trucks/Vehicles, 3 Large Metal Bins, 30 Metal Barrels, 1 Large Empty Metal Tank, 1 Trailer, several tons of miscellaneous metal, trash and tires." See Gosserand Decl. Ex. A, ECF No. 84-11 at 12. Per Plaintiffs, the actual items taken include:

> 4 Chevy truck doors new; 1 50 gallon with pump hand 1930's oil tank (historic value); 1 Small drill press complete; 1 Steel wash bench; 1 Electric well guard for irrigation pump; 1 35 gallon oil tank with hand pump 1930's (historic value); 5 LP.G. tanks; 4 F.M.C. tracks for boxes of produce; 1 Large drill press with Morris taper; 1 Tire changer; 1 Generator 220 volt diesel 15 kilowatts; 1 Weight scales, good condition; 1 4 row week cutter P.T.O. driven; 50 Barrel 55 gallon one end removed; 2 Bath tubs; 2 Steel work bench; 1 Pile miscellaneous tires approx.. 20; 1 4 bed sled harrow farm equipment, new condition; 4 Barrel bolts; 1 56 Chevy truck, new condition; 1 64 Chevy car front end with frame new; 4 Perkins engine diesel, 54 cubic inch good condition; 2 Truck transmissions; 1 6 v 54 engine, new condition; 1 453 t engine no head; 1 Van box with tools, parts & supplies; 1 Pile pipe steel & truck parts front fence; 2 Piles pipe & steel bars rear fence; 1 Piles steel parts pipe & scrap; 1 749 military truck dump, no engine radiator, good condition; 1 Chevy 3/4 t Chevy pickup with locker rear end; 1 Dodge 3/4 ton pickup; 1 Heavy duty 35' cotton trailer; 1 20 ton front out

rigger hydraulic for crane; 1 1930 washing machine (historic value); and 1 Steel truck bed 8' x 12'.

Pls.' Responses to the City of Mendota's Interrogatories, Set One, ECF No. 97-7 at 25-26. The disparity between the items that the Inspection Warrant specifically authorized for abatement and what was actually abated becomes more pronounced as to APN 013-192-09. Compare ECF No. 84-11 at 23 ("The area to be searched, inspected and abated contains several inoperable vehicles including 6 Trucks/Vehicles, 2 Forklifts, 1 Tractor, 1 Trailer, miscellaneous metal, parts and trash.") with ECF No. 87-7 at 23-25 (over 100 line items of seized property, including 2 3000' roles of cable on steel reels, 4 10,000+ gallon tanks, 5 military trucks, and 8 16' pieces of rail road tracks).

In light of this evidence, Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment claim will be granted only as to their entry onto APN 013-152-27s. In all other respects, Defendants' motion will be denied.

**B.    Due Process**

**1.    Procedural Due Process**

Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge, 424 U.S. 319, 332 (1976); see also MacLean v. Dep't of Homeland Sec., 543 F.3d 1145, 1151 (9th Cir. 2008). Mathews "directs us to examine:"

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Brittain v. Hansen, 451 F.3d 982, 1000 (9th Cir. 2006) (quoting Mathews, 424 U.S. at

334-35). In a court's "balancing" of the Mathews factors, "the requirements of due process are 'flexible and call for such procedural protections as the particular situation demands.'" Vasquez v. Rackauckas, 734 F.3d 1025, 1044 (9th Cir. 2013) (citing Wilkinson v. Austin, 545 U.S. 209, 224-25 (2005)) (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)); see also Wynar v. Douglas Cnty. School Dist., 728 F.3d 1062, 1073 (9th Cir. 2013).

To proceed, "[w]e analyze a procedural due process claim in two steps. The first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Vasquez, 734 F.3d at 1042 (quoting United States v. Juvenile Male, 670 F.3d 999, 1013 (9th Cir. 2012), cert. denied, ⸺ U.S. ⸺, 133 S. Ct. 234 (2012) (internal quotation marks and alteration omitted)).

### a.   Pre-Abatement Procedural Due Process

Plaintiffs claim that Defendants did not provide them the constitutionally required notice or an opportunity to be heard before the abatement activity. Defendants move for summary judgment on the ground that their conduct comported with due process. Because the parties do not dispute that Defendants deprived Plaintiffs of property interests implicating their constitutional rights, the Court turns to the second prong: whether the procedural processes were constitutionally sufficient.

Due process requires: (1) "notice," and (2) an "opportunity to be heard at a meaningful time and in a meaningful manner." Schneider, 28 F.3d at 92 (quoting Brock v. Roadway Express, Inc., 481 U.S. 252, 261 (1987)); Mathews v. Eldridge, 424 U.S. 319, 333 (1976) ("[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965))); see also Villa-Anguiano v. Holder, 727 F.3d 873, 881 (9th Cir. 2013). Here, "a meaningful time" describes pre-deprivation because the Supreme Court has repeatedly held that "some form of hearing is required before an individual is

finally deprived of a property interest." <u>Mathews</u>, 424 U.S. at 333 (citations omitted).

Defendants assert that they complied with due process when they mailed the May 2010 Public Nuisance Notices to the names and addresses identified on the last (i.e., June 30, <u>2009</u>) equalized assessment roll for Fresno County. It is undisputed that Tankersley would not have received these notices at the Nubieber address since they pre-date the recording of his ownership interest in parcels APN 013-115-10 and APN 013-152-27s. It is also undisputed that, of the five notices mailed by Defendants, Warkentine received four. But as discussed <u>infra</u>, a reasonable trier of fact could conclude that the procedures employed by Defendants were insufficient in light of the circumstances of this case. Accordingly, the issue of whether Defendants' notices complied with due process is a question best left to the trier of fact.

Turning first to the nuisance notices related to APN 013-115-10 and APN 013-152-27s, Defendants mailed the notices to the owner listed on the June 30, 2009, equalized assessment roll—that is, to Elbert Davidson. Under the circumstances of this case, though, a reasonable trier of fact could conclude that Defendants should have taken additional steps to provide Tankersley with the nuisance notices. As Defendants assert, from and after at least 2007, Tankersley was in regular communication with City officials regarding clean-up efforts on these two parcels. <u>See</u> Defs.' Mot. Summ. J. at 7; Tankersley Dep. at 43:16—44:5 ("Because over the years, periodically, [City officials] would come and talk to you about an abatement and you would go talk with them and say, 'Yes, we have an agreement,' and 'we're working at,' and it would – they would say, 'Okay. We'll work with you.'). While Defendants cite these conversations in to order to impute to this Plaintiff knowledge of the nuisance conditions on the properties, a trier of fact could also find that Defendants were aware of Tankersley's interest in these two parcels before the May 2010 Public Nuisance Notices were mailed and therefore should have taken additional steps to provide him with the nuisance notices  to minimize the risk of erroneous deprivation. <u>See</u> <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339

U.S. 306, 315 (1950) (The notice provided must be "reasonably certain to inform those affected…").

As to the fifth notice mailed to Warkentine concerning APN 013-116-13, Defendants did not receive a signed return receipt from this Plaintiff even though they received one as to each of the four other properties. In Jones v. Flowers, the Supreme Court made plain that when the government sends notice by mail and the notice "is returned unclaimed, the State must take additional reasonable steps to attempt to provide notice to the property owner before [depriving him of his property], if it is practicable to do so." 547 U.S. 220, 225 (2006); see also Yi Tu v. Nat'l Transp. Safety Bd., 470 F.3d 941 (9th Cir. 2006) (same). A party need not actually receive notice, rather, "due process requires the government to provide 'notice reasonably calculated, *under all the circumstances*, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Id. at 226 (quoting Mullane, 339 U.S. at 314) (emphasis added). As discussed supra, Defendants claim that they were in regular communication with Plaintiffs regarding the nuisance conditions on the properties. That being so, a trier of fact could reasonably conclude that, under all of the circumstances of this case, additional steps should have been taken to notify Warkentine of the nuisance conditions on APN 013-116-13, particularly when this Plaintiff signed receipts for the four other notices. An additional procedural safeguard— perhaps a second mailed notice—would have been a minor administrative burden on Defendants in comparison to the costs of an erroneous deprivation of Warkentine's substantial interest in the property on this parcel.

Beyond the mere mailing of these notices, a dispute exists as to whether the Public Nuisance Notices themselves complied with the Due Process clause's notice requirements. Pursuant to Code Section 8.28.050(C), the notices should have included "a description of the conditions which constitute the public nuisance." These notices did not include any information regarding the specific property and/or conditions that

constituted a nuisance. They provided only cursory citations to the Mendota Municipal Code and included only a general statement that the property owners "have the right to appeal." The August 2010 Abatement Notice highlights the deficiencies in the May 2010 Public Nuisance Notices. Unlike the earlier notices, the Abatement Notice gave specific citation to the relevant municipal code under which the City deemed a nuisance condition existed, it specifically identified the property that constituted a nuisance, and it gave the following notice regarding the property owners' right to appeal:

> As owner of the land which said a vehicle [sic] (or said parts of vehicle) is located, you are hereby notified that you may, within ten (10) days after the mailing of this notice of intention, request a public hearing and if such request is not received by the City Manager of the City of Mendota within such ten (10) day period, the City Manager shall have the authority to abate and remove said vehicles (or said parts of a vehicle) as a public nuisance and assess the cost as aforesaid without a public hearing. You may submit a sworn written statement within such ten (10) day period denying responsibility for the presence of said vehicle (or said parts of vehicle) on said land, with our reasons for denial, and such statement required. You may appear in person at any hearing requested by you or the owner of the vehicle(s) or, in lieu thereof, may present a sworn written statement as aforesaid in time for consideration at such hearing.

It was in response to this notice that the Plaintiffs sought an administrative hearing, necessitating the mailing of five additional notices.

Even assuming, however, that the May 2010 Public Nuisance Notices satisfied the Due Process clause, a question remains as to whether Defendants provided Plaintiffs with notice of the pre-deprivation hearing and an opportunity to be heard in a meaningful manner. Examination of the record reveals that there is a genuine dispute of material fact as to both of these questions.

As to the first, after the date on which the deeds transferring ownership from Elbert Davidson were recorded against parcels APN 013-115-10 and APN 013-152-27s,

the equalized assessment roll would have identified Tankersley as the property owner of those parcels and shown the properties' mailing address as P.O. Box 29, Nubieber, California 96068. Indeed, the August 2010 Abatement Notice for APN 013-152-27s was mailed to Tankersley "[a]s owner shown on the last equalized assessment roll of the land …." See Soria Decl. Ex. B, ECF No. 84-5 at 2. However, the City's November 6, 2010, Notice of Administrative Hearing for this same parcel was mailed to Elbert Davidson and not Tankersley. See Soria Decl. Ex. C, ECF No. 84-6 at 2-3. And while each of these notices was mailed to the 1583 Eighth Street, Mendota, California 93640 address (an address at which Tankersley has never received mail), the March 2011 Abatement Decision (which would have also relied on the owner information in the June 30, 2010, equalized assessment roll) was mailed to both the 1583 Eighth Street address (regarding APN 013-152-27) and to PO Box 29, Nubieber, California 96068 (regarding APN 013-115-10). From this one can conclude that Defendants were aware that the Nubieber address was the proper mailing address for at least one of the parcels. Given this inconsistency, a reasonable trier of fact could find that Defendants failed to properly notify Tankersley of the upcoming administrative hearing.

As to the second question, Defendants rely on Plaintiffs' presence and Tankersley's testimony at the hearing, and Defendants' invitation to Plaintiffs to present evidence after the hearing, as evidence Plaintiffs had a meaningful opportunity to contest the City's nuisance determination. The Court disagrees. There is a genuine dispute of material fact as to whether Plaintiffs had the opportunity to be heard "at a meaningful time and in a meaningful manner." Pursuant to the Mendota Municipal Code's Abatement Procedures, a party at an abatement hearing has the right "[t]o call and examine witnesses on any matter relevant to the issues of the hearing," "[t]o cross-examine opposing witnesses on any matter relevant to the issues of the hearing," and "[t]o impeach any witness regardless of which party first called him to testify." Mendota Municipal Code § 8.28.050(H)(5). Plaintiffs—at the very least, Tankersley—asserts that

they were unaware that the hearing's purpose was to consider the nuisance conditions on all of the five properties at issue in this case. A trier of fact could reasonably conclude that, had he known, Tankersley would have called witnesses or prepared adequately to cross-examine Defendant Soria, who also testified at the hearing. The opportunity to submit documentary evidence after the hearing does not remedy the inability to properly prepare, introduce evidence, and/or examine witnesses. Furthermore, as it is undisputed that neither Chojnacki nor the Abatement Decision informed Plaintiffs of their right to appeal the decision to the City Council pursuant to Section 8.28.050(I) of the Mendota Municipal Code. Summary judgment is not warranted on Plaintiffs' pre-deprivation procedural due process claim.

### b.     Post-Abatement Procedural Due Process

In their moving papers, Plaintiffs seek partial summary judgment on their claim that Defendants denied them post-deprivation procedural due process by failing to inform them how to retrieve their seized property before it was destroyed or donated.

Defendants respond that the pre-abatement procedures they followed were all that were required by the Due Process clause and Plaintiffs had to realize that the result of the abatement process was that the property would be destroyed and/or donated.

This latter argument is disingenuous. It is premised on the notice to Plaintiffs that certain vehicles could be removed to a scrapyard, an automobile dismantler's yard, or other suitable site for vehicles or parts pursuant to California Vehicle Code Section 22662. It is true that the August 2010 Abatement Notice identified 9 vehicles on APN 013-152-27s that were deemed a public nuisance pursuant to Section 10.16.090 of the Mendota Municipal Code, and it is also true that, pursuant to Section 10.16.080, those vehicles were subject to destruction. But there is nothing in that notice or in the Mendota Municipal Code that authorizes the destruction and/or donation of any property beyond those 9 identified vehicles; rather, the City Code authorizes only the *removal* of the property. See Mendota Municipal Code § 8.24.160 (trash and junk), § 8.28.050 (public

1   nuisance).

2       Furthermore, the Abatement Decision itself found only that "the *present condition*

3   of the real propert[ies]" violated the Municipal Code, not the *items* on the properties

4   themselves. This finding was separate from Chojnacki's finding that the 9 identified

5   vehicles on APN 013-152-27s were themselves a nuisance. The Ninth Circuit in

6   Schneider addressed a similar scenario. There, the plaintiff owned a 1.4 acre lot where

7   he parked nine buses, two motorhomes, and two automobiles. 28 F.3d at 90. After

8   receiving complaints about the vehicles, the County determined that they constituted a

9   public nuisance. Id. The County failed to persuade the plaintiff to remove the vehicles

10  voluntarily and posted a "NOTICE AND ABATEMENT," informing plaintiff that his

11  vehicles violated various county nuisance ordinances. Id. at 90-91. These vehicles were

12  thereafter seized and destroyed. Although the Ninth Circuit upheld the seizure of

13  vehicles in Schneider, it also found that their subsequent destruction without notice or

14  the opportunity to be heard constituted a violation of due process. Id. at 93. The court

15  explained that while the County's code provided for the disposal of vehicles that had

16  been declared nuisances, the plaintiff's vehicles had not been so designated. Rather,

17  the *location* and *number* of vehicles was deemed a nuisance and abated when the

18  vehicles were seized and removed:

19
20          The County did not violate Schneider's due process rights
            when it abated the nuisance on his property by removing the
21          vehicles. However, the record does not show that the
            vehicles were themselves nuisances. The hearing officer
22          affirmed the nuisance finding pursuant to Regulatory Code §
            16.210, on the theory that Schneider's vehicles were parked
23          in violation of county zoning ordinances. This action was
            binding on the County and Reybro as well as Schneider.
24          Once the vehicles were removed from the property the
            nuisance abatement was complete and the County was only
25          authorized "to otherwise proceed pursuant to sections
            16.212 through 16.217 of the San Diego Code of Regulatory
26          Ordinances." These sections do not authorize the

27
28
                                        28

destruction of vehicles; they provide a procedure for recovering the cost of the abatement proceedings.

28 F.3d at 93.

In this case, once the *condition* of the real properties was realigned with the Municipal Code, the nuisance abatement was complete and the City was only authorized to proceed pursuant to Sections 8.24.160 and 8.28.050, which, as noted supra, did not authorize the destruction or donation of seized personal property. Even assuming then that the pre-deprivation notices were adequate in substance and mailed to the proper individuals, they provided notice only as to the abatement of the nuisance conditions. In other words, other than the 9 identified vehicles on APN 013-152-27s, they provided no notice whatsoever that Plaintiffs would be permanently deprived of their personal property and its value. On these facts, the Court finds as a matter of law that Defendants' destruction and/or donation of Plaintiffs' personal property (other than the 9 identified vehicles) without some form of post-deprivation notice and hearing violated Plaintiffs' due process rights. See Simpson v. City of Roseburg, 2008 WL 5262748, at *7 (D. Or. 2008) ("Though plaintiff made no effort to abate the nuisance and was repeatedly told that his possessions would be removed from the Germond property, plaintiff was not informed that he would be permanently deprived of his property or given the opportunity to reclaim it.") Accordingly, Plaintiffs' motion for partial summary judgment will be granted on their post-deprivation procedural due process claim.

## 2. Substantive Due Process

Defendants also assert that, to the extent Plaintiffs are bringing a substantive due process claim, it fails as a matter of law because the pre-abatement notice Defendants provided was constitutionally sufficient. Although Plaintiffs' operative pleading suggests that Plaintiffs' due process claim is a *procedural* due process claim, see Sec. Am. Compl. ¶ 72 ("The Fourteenth Amendments … guarantees to citizens of the United States, like Ed and Dan here, freedom from the deprivation of life, liberty and property

without due process of law *(i.e., notice and an opportunity to be heard*).") (emphasis added), the complaint can be fairly read to assert a substantive due process claim based on Defendants' post-deprivation conduct (their destruction and/or donation of Plaintiffs' seized personal property). Indeed, in their opposition to Defendants' motion, Plaintiffs confirm that this is the basis of their claim. See Pls.' Opp'n at 15 ("Ed's and Dan's substantive due process claim, however, is based upon the Defendants' conduct *after* they removed Ed's and Dan's valuable personal property from the five parcels.") (Emphasis in original.) Since Defendants' motion seeks summary judgment on this claim related to their pre-deprivation conduct, that motion will be denied as inapposite.

## C.    **Takings**

The Fifth Amendment of the United States Constitution provides, in relevant part, "Nor shall private property be taken for public use, without just compensation." U.S. Const. Amend V. The Fifth Amendment applies to the states through the Fourteenth Amendment. See, e.g., Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 175, n.1 (1985). The Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005).

Plaintiffs' Takings claim is premised on the Defendants' donation of Plaintiffs' personal property to the Towing Defendants. The Takings Clause, of course, prohibits both the taking of private property for public use without just compensation and the taking of private property for private use. Armendariz v. Penman, 75 F.3d 1311, 1321 (9th Cir. 1996). As to the latter, the Constitution forbids a taking executed for no other reason than to confer a private benefit on a particular private party, even when the taking is compensated. Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 245 (1984). But a taking fulfills the public use requirement if it serves any legitimate purpose within the government's authority. Berman v. Parker, 348 U.S. 26, 32-33 (1954).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In this case, Defendants move for summary judgment on the ground that the removal of Plaintiffs' personal property from the five parcels was done pursuant to Defendants' police power. When the government seizes property in the exercise of its police powers, the Takings Clause is not applicable. Acadia Tech., Inc. v. United States, 458 F.3d 1327, 1330 (Fed. Cir. 2006).  The Court agrees – and Plaintiffs do not dispute – that the *removal* of the personal property falls within the Defendants' police powers. See, e.g., Missud v. California, 2013 WL 450391, at *4 (N.D. Cal. Feb. 5, 2013) ("Towing cars that have accumulated an excessive number of parking tickets is an exercise of police power, not a taking for public purposes within the meaning of the Takings Clause."); McCain v. Stockton Police Dept., 2011 WL 4710696, at *5 (E.D. Cal. Oct. 4, 2011) ("[A]ny claim that plaintiff's Vehicle was taken 'without just compensation' fails as a matter of law, because 'property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause' of the Fifth Amendment.") (citing AmeriSource Corp. v. United States, 525 F.3d 1149, 1153 (Fed. Cir. 2008)).

Plaintiffs' claim, though, takes the issue one step further. They argue that, once their personal property was removed and the nuisance conditions were abated, the City's subsequent donation of that property to the Towing Defendants violated the Fifth Amendment's prohibition against takings for private use. The Court disagrees. "The mere fact that property taken outright … is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose." Hawaii Housing Auth., 467 U.S. at 243-44. "[G]overnment does not itself have to use property to legitimate the taking; it is only the taking's *purpose*, and not its mechanics, that must pass scrutiny under the Public Use Clause." Id. (emphasis added).

Plaintiff's reliance on Armendariz v. Penman, 75 F.3d 1311 (9th Cir. 1996) (en banc), overruled in part on other grounds as stated in Crown Point Dev., Inc. v. City of Sun Valley, 506 F.3d 851, 852-53 (9th Cir. 2007), does not require the Court to reach a

different result. There, the defendant city had conducted a series of housing code enforcement sweeps supposedly to reduce "urban blight." 75 F.3d at 1314. However, the plaintiffs alleged that the actual purpose of this sweep was to deprive plaintiffs of their property so a commercial shopping center developer could acquire it cheaply. Id. Unlike the plaintiffs in Armendariz, the Plaintiffs here do not argue that the City's nuisance activity was a pretext in order to transfer their property to the Towing Defendants. On this ground, Armendariz is not controlling.

Accordingly, summary judgment will be entered for Defendants on Plaintiffs' Takings claim. Plaintiffs' motion for partial summary judgment will therefore be denied.

**D.    Equal Protection Clause**.

The purpose of the Fourteenth Amendment is to protect individuals from arbitrary and intentional discrimination. Vill. of Willowbrook v. Olech, 528 U.S. 562, 564-65 (2000). Plaintiffs have not alleged membership in a protected class. Nonetheless, a successful equal protection claim can be brought by a "class of one" when a plaintiff (or, in this case, two plaintiffs) "alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id. However, such claims must show that the plaintiff was discriminated against intentionally, rather than accidentally or randomly. N. Pacifica LLC v. City of Pacifica, 526 F.3d 478, 486 (9th Cir. 2008).

Disparate classifications can arise through discriminatory state enforcement. SeaRiver Mar. Fin. Holdings Inc. v. Mineta, 309 F.3d 662, 679 (9th Cir. 2002). When a state discriminately enforces a regulation thereby denying a targeted "class of one" equal protection under the law, an unequal enforcement claim can arise. Id. Three elements must be met: (1) selective discriminatory state enforcement, (2) that is "intentional or purposeful" either on its "face" or in "design," (3) for which "there is no rational basis for the difference in treatment." Id.; Snowden v. Hughes, 321 U.S. 1, 8 (1944); Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

"Such circumstances state an Equal Protection claim because, if a state actor classifies irrationally, the size of the group affected is constitutionally irrelevant." <u>Lazy Y Ranch Ltd. v. Behrens</u>, 546 F.3d 580, 592 (9th Cir. 2008). The rationale is that "[w]hen those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to assure that all persons subject to legislation or regulation are indeed being 'treated alike, under like circumstances and conditions.'" <u>Engquist v. Oregon Dep't of Agric.</u>, 553 U.S. 591, 602 (2008).

Plaintiffs' Equal Protection claim is predicated on their assertion that they were treated differently than the Towing Defendants even they all were engaged in the same conduct that gave rise to the nuisance abatement activity. Defendants move for summary judgment on this claim because Plaintiffs cannot establish that they were similarly situated to the Towing Defendant and because there was a rational basis for Defendants' conduct.

Courts "should enforce the similarly-situated requirement with particular strictness when the plaintiff invokes the class-of-one theory rather than the more settled cognizable-group theory." <u>JDC Mgmt., LLC v. Reich</u>, 644 F. Supp. 2d 905, 926 (W.D. Mich. 2009). Class-of-one plaintiffs "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." <u>Clubside, Inc. v. Valentin</u>, 468 F.3d 144, 159 (2d Cir. 2006). The Seventh Circuit has held that to "be considered similarly situated, the class of one challenger and his comparators must be prima facie identical in all relevant respects or directly comparable in all material respects." <u>U.S. v. Moore</u>, 543 F.3d 891, 896 (7th Cir. 2008). Strict "enforcement of the similarly-situated requirement is a vital way of minimizing the risk that, unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision" made by state actors. <u>Reich</u>, 644 F. Supp. 2d at 927.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here, no reasonable trier of fact would find that Plaintiffs are similarly-situated to the Towing Defendants in the necessary material respects. Unlike the Towing Defendants, the Plaintiffs do not have a junk dealer's license or an auto-dismantling license, and they do not conduct any business in the City.[11] See Tankersley Dep. at 76:17-25; Warkentine Dep. at 57:10-17. In contrast, the Towing Defendants were licensed auto dismantlers and junk dealers. See A. Gonzalez Dep. at 93:13-15 (Question: "Have any of the vehicles on your property received any vehicle abatement warnings?" Answer: "No. The reason why is because they're under a fenced area and we're licensed auto dismantler for the State of California. So we're licensed for that.") While there may be some similarities between Plaintiffs and the Towing Defendants, including proximity of real property and accumulation of similar items on the properties, this does not amount to "an extremely high degree of similarity" necessary for this claim. Plaintiffs are correct that "whether parties are similarly situated is a fact-bound inquiry and, as such, is normally grist for the jury's mill," see Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007), "[b]ut that does not mean that every case, regardless of the proof presented, is a jury case. Id. Since the undersigned finds that the Plaintiffs have not met their burden as to this element of their Equal Protection claim, Defendants' motion for summary judgment must be granted.

### E.   Municipal Liability

In Gillette v. Delmore, the Ninth Circuit set out three ways for a plaintiff to establish municipal liability: First, "the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a

---

[11] In opposition to Defendants' motion for summary judgment, Tankersley claims that he and Warkentine were in the business of selling scrap and of towing vehicles, just like the Towing Defendants. Tankersley Decl. ¶¶ 41-42. This, however, contradicts Tankersley's deposition testimony that he does not do any business in the City of Mendota. See Schuyler v. United States, 987 F. Supp. 835, 840 (S.D. Cal. 1997) ("[A] party opposing summary judgment cannot create a genuine issue of fact by contradicting or repudiating his own sworn deposition testimony"). Even if true, though, the Court concludes that it does not bridge the gap between Plaintiffs and the Towing Defendants.

longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." 979 F.2d 1342, 1346-47 (9th Cir. 1992). Second, "the plaintiff may establish that the individual who committed the constitutional tort was an official with 'final policy-making authority' and that the challenged action itself thus constituted an act of official governmental policy." Id. When there is such "final policy-making" authority, a "single decision" by a municipal policymaker may be enough for Monell liability under certain circumstances. Id. (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986)). Finally, "the plaintiff may prove that an official with final policymaking authority ratified a subordinate's unconstitutional decision or action and the basis for it." Id. at 1347.

### 1.    Failure to Train

"Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996), holding modified by Navarro v. Block, 250 F.3d 729 (9th Cir. 2001). However, the Ninth Circuit has "long recognized that a custom or practice can be 'inferred from widespread practices or "evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded."'" Hunter v. County of Sacramento, 652 F.3d 1225, 1233-34 (9th Cir. 2011) (quoting Nadell v. Las Vegas Metro. Police Dep't, 268 F.3d 924, 929 (9th Cir. 2001)). "[E]vidence of inaction—specifically, failure to investigate and discipline employees in the face of widespread constitutional violations—can support an inference that an unconstitutional custom or practice has been unofficially adopted by a municipality." Hunter, 652 F.3d at 1234 n.8 (emphasis in original).

More relevant here, courts have found that "in some circumstances a policy of inaction, such as a policy of failing to properly train employees, may form the basis for municipal liability." Hunter, 652 F.3d at 1234 n.8. "[A] local government's decision not to

train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick v. Thompson, 563 U.S. 51 (2011). However, to satisfy § 1983 for a failure to train claim, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' Only then 'can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.'" Id. (quoting Canton, 489 U.S. at 388). The deliberate indifference standard has been discussed thoroughly by the Supreme Court:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." ... [¶]
>
> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

Connick, 131 S. Ct. at 1360 (internal citations omitted) (citing Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 410 (1997); Canton, 489 U.S. at 395.).

Defendants assert that summary judgment is warranted because there is nothing in the record regarding any official policy on code enforcement training or a failure to train that amounts to deliberate indifference. They also argue that there is no evidence of a causal link between any failure to train and any alleged constitutional injury.

The Court agrees with Defendants that summary judgment must be entered on Plaintiffs' failure to train theory of liability. Even assuming, as the Court must, that Plaintiffs are able to establish that the City did not provide sufficient training on nuisance abatement to either the City Manager and/or Code Enforcement Officers, it does not necessarily follow that the City's failure to train "will so obviously [cause its employees to] make wrong decisions that failing to train them amounts to a 'decision by the city itself to violate the Constitution.'" Connick, 563 U.S. at 71 (citing Canton, 489 U.S. at 395)). There is simply no showing of deliberate indifference on the facts in the record. To preclude summary judgment, Plaintiffs were required to present some evidence that the City was on notice that, absent additional specified training, it was 'highly predictable' that the City Manager and/or Code Enforcement Officers would violate the constitutional rights of property owners. See id. This showing must be "*so* predictable that failing to train the [City Manager and/or Code Enforcement Officers] amounted to *conscious disregard* for [Plaintiffs'] rights." Id. (emphasis in original). Plaintiffs have not done that here. Accordingly, their failure to train claim fails.

### 2.  Custom or Policy

Plaintiffs stand on better footing with their theory of liability based on a policy or custom. Policy, in the narrow sense of discrete, consciously adopted courses of governmental action, may be fairly attributed to a municipality either because (1) it is directly "made by its lawmakers," i.e., its governing body, Monell, 436 U.S. at 694, or (2) it is made by a municipal agency, see, e.g., id. at 661 & n.2 (policy of city board of education and department of social services) or official, see Pembaur, 106 S. Ct. at 1300-01 (policy decision of county prosecutor), having final authority to establish and

implement the relevant policy. A municipal agency or official may have final policymaking authority by direct delegation from the municipal lawmaking body, see, e.g., Wellington v. Daniels, 717 F.2d 932, 936 (4th Cir. 1983) (delegation of law enforcement policymaking authority to police chief assumed) or by conferral from higher authority, see, e.g., Pembaur, 106 S. Ct. at 1301 (county prosecutor's authority to act for county conferred by state law). Delegation may be express, as by a formal job-description, see Bennett v. City of Slidell, 728 F.2d 762, 769 (5th Cir. 1984), or implied from a continued course of knowing acquiescence by the governing body in the exercise of policymaking authority by an agency or official, see id. (delegation "by conduct or practice [which] encourage[s] or acknowledge[s] the agent in a policymaking role").

Defendants seek summary judgment on this theory of liability because there is no evidence that the City has a policy regarding nuisance abatements, and it cannot be said that Chojnacki, as the City Manager, was the official with final decision-making authority. They argue that Chojnacki's exercise of her discretionary authority cannot serve as the basis of municipal liability.

Generally, liability may arise "if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker ... [or] if a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware." Gillette, 979 F.2d at 1347 (9th Cir. 1992) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988)). However, a policymaker must "approve a subordinate's decision and the basis for it before the policymaker will be deemed to have ratified the subordinate's discretionary decision." Id. at 1348. "[U]nconstitutional discretionary actions of municipal employees generally are not chargeable to the municipality under section 1983." Id. Mere authority to exercise discretion while performing particular functions does not make the individual a final policymaker unless the decisions are final and unreviewable and are not constrained by

the official policies of superior officials. Praprotnik, 485 U.S. at 126-28. Determining who has authority to make final policy is a legal question governed by state law. See Gillette, 979 F.2d at 1346-47. Relevant to the inquiry are "statutes, ordinances, regulations, city charters, and other similar enactments." Coming Up, Inc. v. City and County of San Francisco, 830 F. Supp. 1302, 1308 (N.D. Cal. 1993).

In support of their motion, Defendants rely on Section 2.12.050 of the Mendota Municipal Code, which provides that "[t]he city manager shall act as the agent for the city council in the discharge of its administrative functions, *but shall not exercise any policymaking or legislative functions whatsoever*…" (emphasis added). Plaintiffs are correct, though, that this is not determinative of the issue. "Though these structural provisions provide a helpful starting point for our analysis, the [City]'s label … informs but of course cannot determine the result of our functional inquiry." Goldstein v. City of Long Beach, 715 F.3d 750, 755 (9th Cir. 2013) (citing McMillian v. Monroe Cnty., 520 U.S. 781, 792 n.7 (1997) (finding "little merit" in the fact that the sheriff is indicated in the code among "county officials" or "county employees")).

Defendants next claim that Chojnacki cannot be deemed a policymaker because the City Council exercises final authority. But "[a] municipal governing body may not avoid attribution of policy to itself simply by officially retaining unexercised ultimate authority to countermand a policy or to discipline or discharge the policymaker." Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987).

The question here is whether Chojnacki or the City Council "possesses final authority to establish municipal policy with respect to the action ordered." Penbaur, 75 U.S. at 482. Plaintiffs argue that, even if the City Council had final decision-making authority pursuant to the Mendota Municipal Code, the City Council members relied entirely on the City Manager to establish a policy regarding nuisance abatements with no evidence of the exercise of any supervisory powers. See, e.g., J. Amador Dep. at 43:16-20 ("[D]irections had been given to the city manager, it's make sure for health and

safety reasons, let's address some issues in our community. … [A]s far as direction policy that's been given to our city managers to address…"); Silva Dep. at 26:3-4 ("[Code enforcement] was something [the code enforcement staff] would do on their own."), at 26:13-16 ("I don't know of the intricate ways Code Enforcement does, or city managers, what they're doing, and it's not privy to us and as long as they're doing their job, we don't get involved.") Additionally, the Code Enforcement Officers testified that they relied on the direction of the City Manager in conducting abatements; Defendant Soria testified that he could not remember getting any code enforcement policies and procedures, <u>see</u> Soria Dep. at 46:15-16; and there is otherwise no evidence that Chojnacki's decisions were anything but final, unreviewable, and not constrained by the official policies of superior officials. Construing all evidence in Plaintiffs' favor, summary judgment must be denied because a triable issue of fact exists as to whether the City Council members' hands-off approach to nuisance abatements and the delegation of authority to the City Manager resulted in the latter's de facto policy-making authority, contrary to the directive of Section 2.12.050.

### F.   Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Mattos v. Agarano</u>, 661 F.3d 433, 440 (9th Cir. 2011) (citing <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (additional citation omitted)). "Qualified immunity shields an officer from liability even if his or her action resulted from a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." <u>Id.</u> (citation and quotation marks omitted). "The purpose of qualified immunity is to strike a balance between the competing need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Id.</u> (citation and quotation marks omitted).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In determining whether an official is entitled to qualified immunity, courts employ a two-pronged inquiry: first, did the state actor violate the plaintiff's constitutional right; if the answer to that question is "yes," courts must then determine whether the constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question. Id. (citing Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009) and Saucier v. Katz, 533 U.S. 194, 201 (2001)). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Lal v. California, 746 F.3d 1112, 1116 (9th Cir. 2014) (citation omitted), cert. denied, —— U.S. ——, 135 S. Ct. 455 (2014).

"For the second step in the qualified immunity analysis—whether the constitutional right was clearly established at the time of the conduct—the critical question is whether the contours of the right were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " Mattos, 661 F.3d at 442 (quoting Ashcroft v. al–Kidd, 563 U.S. 731 (2011); some internal marks omitted). "The plaintiff bears the burden to show that the contours of the right were clearly established." Clairmont v. Sound Mental Health, 632 F.3d 1091, 1109 (9th Cir. 2011). "[W]hether the law was clearly established must be undertaken in light of the specific context of the case[.]" Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th Cir. 2002) (citation and internal marks omitted). In making this determination, courts consider the state of the law at the time of the alleged violation and the information possessed by the official to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); Hope v. Pelzer, 536 U.S. 730, 741 (2002) (the "salient question" to the qualified immunity analysis is whether the state of the law at the time gave "fair warning" to the officials that their conduct was unconstitutional). "[W]here there is no case directly on point, 'existing precedent must

have placed the statutory or constitutional question beyond debate.'" <u>C.B. v. City of Sonora</u>, 769 F.3d 1005, 1026 (9th Cir. 2014) (citing <u>al–Kidd</u>, 131 S. Ct. at 2083). An official's subjective beliefs are irrelevant. <u>Inouye</u>, 504 F.3d at 712.

In light of its finding that Defendants are entitled to summary judgment on Plaintiffs' Takings and Equal Protection claims, the Court will focus its qualified immunity analysis on Plaintiffs' Search and Seizure and Procedural Due Process claims.

### 1.    Police Officer Defendants

The parties' analysis regarding the liability of the police officer Defendants is scarce. The only evidence before the Court is that they were present at the abatements in order to keep the peace and to assist the Code Enforcement Officers with filling out forms for inoperative vehicles. Because there is no argument from Plaintiffs in opposition to Defendants' motion for summary judgment on qualified immunity grounds, the Defendants' motion will be granted as to the police officer Defendants.

### 2.    Search and Seizure

As noted above, the Fourth Amendment prohibits unreasonable searches and seizures. This law was clearly established at the time of the September 2011 abatement such that no reasonable City Manager and/or Code Enforcement Officer would believe that the warrantless seizure of personal property on APN 013-152-27s, the unfenced parcel, was authorized by the Fourth Amendment. Accordingly, neither Chojnacki nor Soria is entitled to qualified immunity on this claim regarding this abatement activity.

Similarly, none of the Defendants are entitled to qualified immunity on Plaintiffs' Fourth Amendment claim regarding the fenced parcels. The law was clearly established that an inspection warrant and/or its accompanying affidavit must particularly describe the items to be seized, leaving no discretion to the executing officer. As discussed in depth <u>supra</u>, "[t]he requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." <u>Stanford v. State of Tex.</u>, 379 U.S. 476, 485-86 (1965) (citations omitted). Contrary to Defendants' argument, this "mistake" of vagueness was not reasonable under the circumstances.

### 3.  Due Process

The Court next considers Defendants' qualified immunity argument related to Plaintiffs' due process claims. In their moving papers, Defendants focus on their pre-deprivation activity. As for that conduct, qualified immunity is not appropriate in light of the Supreme Court's clear directive that notice and an opportunity to be heard must be given that is reasonably likely to inform property owners of a property deprivation. Under the circumstances of this case, the reasonableness of Defendants' pre-deprivation notice is in dispute.

For the first time in their reply to Plaintiffs' opposition, Defendants assert that qualified immunity is also appropriate as to their post-deprivation conduct. The Court, however, will not entertain new arguments raised for the first time in a reply. <u>See</u> <u>Ellison Framing, Inc. v. Zurich American Ins. Co.</u>, 805 F. Supp. 2d 1006, 1011 n.1 (E.D. Cal. 2011) (noting that "[t]he court typically cannot consider arguments first raised in reply"). Although Defendants do address this issue, briefly, in their opposition to Plaintiffs' motion for partial summary judgment, it is based on generalized recitations of the law and on reference to their moving papers. <u>See</u> Defs.' Opp'n at 9. Thus, even if the Court did entertain Defendants' argument, in the absence of adequate briefing on this issue, the Court cannot rule on it.

## VI.   <u>CONCLUSION</u>

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment (ECF No. 84) is GRANTED IN PART and DENIED IN PART as follows:

43

a. GRANTED as to Plaintiffs' Fourth Amendment Search (but <u>not</u> Seizure) claim related to APN 013-152-27s, as to Plaintiffs' Fifth Amendment Takings Claim, and as to Plaintiffs' Equal Protection claim. Defendants' motion is also granted as to the qualified immunity of the police officer Defendants; and

b. DENIED as to Plaintiffs' Fourth Amendment Seizure claim related to APN 013-152-27s, as to Plaintiffs' Fourth Amendment Search and Seizure claim related to the fenced parcels, and as to Plaintiffs' Due Process claim. Defendants' motion is also denied on the questions of <u>Monell</u> liability for the City and qualified immunity for the individual Defendants (Chojnacki, Soria, and Gosserand).

2. Plaintiffs' motion for partial summary judgment (ECF Nos. 86-87) is GRANTED IN PART and DENIED IN PART as follows:

a. GRANTED as to their Post-Deprivation Procedural Due Process claim; and

b. DENIED as to their Takings claim and on the question of the City's and the individual Defendants' liability.

3. Defendants Joseph Amador, Leo Capuchino, John Flores, Robert Silva, Joseph Riofrio, Hector Lizzaraga, Bryce Atkins, Johnny Lemus, Francisco Amador, and Gerry Galvin are DISMISSED WITH PREJUDICE; and

///
///
///
///
///
///
///

4. This action will proceed against the City, Chojnacki, Soria, Gosserand, and the Towing Defendants on Plaintiffs' Fourth Amendment Search and Seizure claim (but <u>not</u> their Search claim related to APN 013-152-27s) and on their Fourteenth Amendment Due Process claim.

IT IS SO ORDERED.

Dated:   <u>January 21, 2016</u>          <u>/s/ Michael J. Seng</u>
                                  UNITED STATES MAGISTRATE JUDGE